**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DR. SARAH BOYSEN, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Case No. 06-CV-150 |
| : | |
| DR. KAREN HOLBROOK, *et al.*, : | JUDGE ALGENON L. MARBLEY |
| : | Magistrate Judge Abel |
| Defendants. : | |
| : | |

**OPINION AND ORDER**

**I.  INTRODUCTION**

This action filed by Dr. Sarah Boysen ("Boysen" or "Plaintiff") against three officials of The Ohio State University ("OSU") involves the allegedly illicit transfer of nine chimpanzees ("chimps") from the Chimpanzee Cognition Center (a.k.a. the Comparative Cognition Project) at OSU (the "Chimp Center") to Primarily Primates, Inc. ("PPI"), an animal care facility in Texas.

Plaintiff is a renowned primate researcher, tenured professor of psychology at OSU, and former Director of the Chimp Center.  Defendant, Dr. Karen Holbrook ("Holbrook"), is President of OSU.  Defendant, Dr. William Yonushonis ("Yonushonis"), is Director of University Laboratory Animal Resources at OSU.  Defendant, Dr. Robert McGrath ("McGrath"), is Senior Vice President for Research at OSU.

In her complaint, Plainitiff asserts that she owned nine chimps that were housed and cared for at the Chimp Center.  Plaintiff contends that Defendants transferred these chimps to PPI instead of Chimp Haven, a chimp retirement home in Louisiana, in violation of the Parties'

previous agreements.  Plaintiff makes three claims for relief.  First, she alleges that Defendants abridged her rights under 42 U.S.C. § 1983 by taking the chimps without providing her just compensation in violation of the Fifth and Fourteenth Amendments.  Second, she alleges that Defendants abridged her rights under 42 U.S.C. § 1983 by taking the chimps without providing her due process in violation of the Fourteenth Amendment.  Third, she alleges that Defendants breached certain contracts relating to the chimps.

Plaintiff brings suit against Defendant Holbrook in her official capacity.  Plaintiff brings suit against Defendants Yonushonis and McGrath in both their official and personal capacities.  Plaintiff seeks three forms of relief: (1) a declaration that Defendants violated her Fifth and Fourteenth Amendment Rights; (2) an injunction preventing Defendants from denying her access to the Chimp Center and enjoining Defendants from transporting the chimps from the Chimp Center; and 3) compensatory and punitive damages.

This matter is now before the Court on Defendants Motion for Summary Judgment.  Defendants assert that they are protected from Plaintiff's claims by sovereign immunity, state statutory immunity, and qualified immunity.  For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED.**

## II.  BACKGROUND

Plaintiff is a world renowned primate researcher and former Director of the Chimp Center.  She began her directorship in 1983.  She has also been a psychology professor at OSU since 1991, receiving tenure in 1997.

Over the course of the last two decades, the Chimp Center obtained eleven chimps.  There names are: Digger, Abby, Kermit, Bobby, Sheba, Ivy, Keeli, Darrell, Sarah, Emma, and

Harper. Two of these chimps, Digger and Abbey, died in 2003 while at the Chimp Center. Two others, Kermit and Bobby, died after their transfer to PPI. Federal grants to OSU and over $1 million in donations for various departments at OSU paid for the majority of the chimps' housing and maintenance costs.[1]

Beginning in 2000, federal grant monies for programs like those conducted at the Chimp Center began to dissipate. Plaintiff and OSU commenced looking for alternative sources of funding for the Chimp Center and other living arrangements for the chimps. In July 2003, after several of Plaintiff's grant proposals did not meet with success, the Parties redoubled their efforts to find alternative funding or new facilities for the chimps.

In January 2004, when it became apparent that there would not be enough funding to sustain the Chimp Center, OSU entered into two Memoranda of Understanding. The relevant offices at OSU (the Department of Psychology, College of Social and Behavioral Sciences, Office of Research, and Office of Academic Affairs) entered into an agreement that outlined a plan for the future of the Chimp Center (the "OSU MOU"). The OSU MOU anticipated closing the Chimp Center and transferring the chimps to Chimp Haven in the event that "sufficient external funding [for the Chimp Center] ceases to be available." At the same time, OSU and Chimp Haven entered into a memorandum of understanding in which Chimp Haven stated its intention to accept nine chimps from OSU, thereby relinquishing OSU of the obligation to provide financial resources for the care of the chimps (the "Chimp Haven MOU").

---

[1] Plaintiff attempts to paint the picture that it was somehow "her" personal grant money that was used to pay for the chimps. She provides no evidence of this. Based on several affidavits and other evidence, the record reflects that most of the money used for the chimps went from the federal government to OSU and then to the Chimp Center.

In early 2006, OSU determined that the prospect of finding additional funds to sustain the Chimp Center no longer existed. Subsequently, OSU attempted to finalize arrangements to send the Chimps to Chimp Haven. Their efforts proved unsuccessful. As a result, OSU looked for another facility at which the chimps could retire. On February 21, 2006, Defendant McGrath met with Plaintiff to discuss the disposition of the chimps. At the close of their meeting, he presented Plaintiff with a letter which outlined OSU's plan to close the Chimp Center and ship the chimps to PPI. Thereafter, Plaintiff filed this lawsuit and sought a TRO restraining Defendants from closing the Chimp Center and shipping the chimps to PPI. On February 27, 2006, this Court denied Plaintiff's request for a TRO.

Subsequently, both PPI and Chimp Haven have been the subject of litigation regarding the quality of their facilities and the care that they provide their retired animals. As a result of this litigation, the chimps were transferred from PPI to Chimp Haven, as Plaintiff had originally desired.

On June 16, 2006, Defendants filed the present Motion for Summary Judgment, to which Plaintiff and Defendants filed a memorandum contra and a reply memorandum, respectively. Defendants' Motion for Summary Judgment is now ripe for adjudication.

### III. STANDARD of REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party

lacks evidence to support an essential element of its case. *Celotex Corp. v. Vatrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex, 477 U.S. at 324; Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1995).

## IV. LAW and ANALYSIS

### A. Sovereign Immunity

Defendants assert that, to the extent that they are being sued in their official capacities as state officials, they are protected by the doctrine of sovereign immunity.

Defendants argue they are immune from suit in their official capacities under the Eleventh Amendment to the United States Constitution which provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.

The Eleventh Amendment has been extended judicially to prevent a federal court from hearing a suit brought by a citizen against his own state, or agencies of the state, unless the state has waived its sovereign immunity. *Hans v. Louisiana*, 134 U.S. 1 (1890). OSU, as a state run university, is an "arm of the state" for the purposes of the 11th Amendment. *See, e.g., Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 301 (6th Cir. 1984). Defendants, therefore, are officers of the state. The Eleventh Amendment also shields state officials who are sued in their official capacities for monetary damages. *Kentucky v. Graham*, 473 U.S. 159 (1985). Thus, Defendants and are immune from suit in their official capacities to the extent that Plaintiff seeks monetary damages from them. Plaintiff does dispute this in her response brief.

Plaintiff, in addition to monetary damages, seeks declaratory and injunctive relief. The Supreme Court, in *Green v. Mansour*, 474 U.S. 64, 64-65 (1985), held that a petitioner is not entitled to declaratory relief against state defendants where a plaintiff only claims that defendants violated the law in the past and there is no allegation of a continuing violation or threat of a future violation.

In this case, Plaintiff seeks a declaration that Defendants violated her Fifth and Fourteenth Amendment rights by transporting the chimps from the Chimp Center without providing her adequate process. Her allegations relate only to Defendants past behavior. She does not contend that Defendants are committing an ongoing violation of her rights or present a threat of future violations. Defendants are immune from suit in their official capacities,

therefore, to the extent that Plaintiff seeks declaratory relief. Plaintiff does not dispute this in her response brief.

Sovereign immunity does not, however, preclude suits against state officers for prospective injunctive relief. *See Ex Parte Young*, 209 U.S. 123 (1908); *Kentucky v. Graham*, 473 U.S. 159 (1985); *Foulks v. Ohio Dept. of Rehab. and Corr.*, 713 F.2d 1229 (6th Cir. 1983). Federal courts may not award retrospective relief, such as money damages or its equivalent, if the State invokes its immunity. *Edelman v. Jordan*, 415 U.S. 651 (1974). Thus, this Court must examine whether the declaratory relief that Plaintiff seeks is prospective or retrospective. In her complaint, Plaintiff specifically asks the Court to:

> Issue temporary, preliminary and permanent injunctive relief enjoining the defendants from denying plaintiff access to the Chimpanzee Center, her chimpanzees, and her research materials and from transporting the chimpanzees to any location from the Chimpanzee Center.

Defendants contend that, as the circumstances have turned out, Plaintiff's request is either moot or constitutes a request for retrospective injunctive relief. Defendants' argument is well-taken. The Chimp Center is already closed and the Chimps are no longer in OSU's possession. In fact, the chimps currently reside at Chimp Haven, the exact institute that Plaintiff requested that they be sent to when the Chimp Center shut down. The Court cannot enjoin Defendants from committing acts that they have already completed. Defendants no longer have possession or legal control of the chimps. Hence, Plaintiff's above-referenced request for injunctive relief is moot.

In her response brief, Plaintiff does not contest that the aforementioned injunctive relief is moot. Rather, she asks for different injunctive relief. Specifically, Plainitiff contends that while the chimps have been moved from PPI to Chimp Haven, three monkeys still remain at PPI.

She requests that this Court order that these monkeys be transferred to her possession. Additionally, she asks this Court to order Defendants to re-open the Chimp Center and then require that Defendants involve Plainitiff in "the process of determining whether there will be sufficient funds to continue to operate the Chimp Center." If there are sufficient funds to sustain her research at the Chimp Center, Plaintiff requests that this Court order Defendants to return the chimps from Chimp Haven to the Chimp Center at their own cost. Plainitiff contends that this newly requested relief is prospective, and as such, Defendants are not entitled to sovereign immunity for the claims stated against them in their official capacities.

Plaintiff's arguments are not well-taken for a myriad of reasons. Plainitiff has not received leave from this Court to amend her complaint to request this new injunctive relief. The injunctive relief that Plainitiff requested in her complaint is stated verbatim above. Plainitiff offers no reason and cites no precedent as to why this Court should allow her to pursue new avenues of injunctive relief at this stage in the proceedings. More importantly, injunctive relief, even prospective injunctive relief, against state officers named in their official capacities "should not be granted if the relief is tantamount to an award for past violation of federal law, even though styled as something else." *Barton v. Summers*, 293 F.3d 944, 949 (6th Cir. 2001) (citations omitted). Plaintiff's complaint is based entirely on the past conduct of Defendants and therefore does not fall within the exception outlined in *Ex Parte Young*. *See, e.g., Gean v. Hattaway*, 300 F.3d 758, 776 (6th Cir. 2003). Plaintiff's new demand that Defendants re-open the Chimp Center and ship the chimps back to the Center is tantamount to requesting money damages to rectify Plaintiffs prior conduct – the allegedly illegal closing of the Chimp Center and the removal of the chimps. It will cost Defendants a significant sum of money to reopen the

Chimp Center, repurchase the chimps, and to ship the chimps back to Ohio. For these reasons, Defendants' Motion for Summary Judgment is **GRANTED** insofar as Plaintiff cannot sustain any of her claims against Defendants in their official capacities because they are barred by sovereign immunity.

### B. State Statutory Immunity

Planitiff's claims against Defendants Yonushonis and McGrath in their indivdual capacities are not barred by sovereign immunity. *See, generally, Ex Parte Young*, 209 U.S. 123 (1908). Defendants Yonushonis and McGrath, however, argue that the doctrine of state statutory immunity bars Plaintiff from bringing her state law breach of contract claim against them in their individual capacities.

In determining whether Defendants are entitled to immunity on Plainitff's contract claim, this Court must examine Ohio state law to ascertain the nature of the immunity, if any. *Powell v. Morris*, 184 F.R.D. 591, 597 (S.D. Ohio 1998) (Marbley, J.) ("First, this Court lacks jurisdiction with regard to Plaintiff's state law claims against Defendants Morrison, Shutte and Wamsley in their individual capacities because of immunity established by Ohio law. When faced with a claim of immunity to a pendent state claim, federal courts look to the appropriate state law to ascertain the nature of the immunity given.")

Under Ohio law, "the determination of whether a state employee was acting within the scope of his employment is exclusively the province of the Ohio Court of Claims." *Id.* Ohio Revised Code § 9.86 states, in relevant part, that:

> No officer or employee shall be liable in any civil case that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or

employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Ohio Revised Code § 2743.02(f) states that:

> A civil action against a state officer or employee that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to civil immunity under Ohio Revised Code § 9.86 and whether the courts of common pleas have jurisdiction over the civil action.

Based in part on these statues, the Sixth Circuit in *Haynes v. Marshall*, 887 F.2d 700, 705 704, held that a federal district court cannot exercise pendent jurisdiction over a state law claim regarding the individual liability of state officers until the Ohio Court of Claims has determined whether the officers are entitled to immunity. Plaintiff has not brought the appropriate action in state court to determine whether immunity applies. Accordingly, this Court does not have jurisdiction over Plainitiff's breach of contract claim. Planitiff in no way addresses this argument. Because this Court does not have jurisdiction over Plaintiff's contract claim, Defendants' Motion for Summary Judgment as it applies to Plaintiff's contract claim is **GRANTED**.

### C. Qualified Immunity

This Court has already held that all three of Plaintiff's claims are barred as they apply to Defendants in their official capacity. It has also held that it lacks jurisdiction over Planitiff's

state law claim. Thus, Plaintiff has only two Section 1983 claims pending, both of which Plaintiff asserts against Defendants Yonushonis and McGrath in their personal capacities. Defendants contend that they are entitled to qualified immunity on these two claims.

Qualified immunity, or "good faith" immunity, is an affirmative defense that the defendant officer must raise. *Siegert v. Gilley*, 500 U.S. 226 (1991). Qualified immunity is generally a question of law to be decided by the Court. *Hunter v. Bryant*, 502 U.S. 224 (1991). The Supreme Court set an objective standard for determining when qualified immunity applies: "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Burchett v. Keifer*, 310 F.3d 937, 942 (6th Cir. 2002).

Courts should engage in a two step analysis when determining if an officer is entitled to qualified immunity. *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004). First, the court must consider whether the officer violated a constitutional right. *Id.* Second, the Court should determine if the right is one that is clearly established such that a reasonable officer should know that his conduct violates the right. *Id.* The Court should examine whether the plaintiff has offered sufficient evidence to indicate that the official's action was objectively unreasonable in light of plaintiff's clearly established constitutional rights. *Feathers v. Aey,* 319 F.3d 843, 847 (6th Cir. 2003) (quotations and citations omitted). In doing so, the Court should look to the preponderance of the evidence and not clear and convincing evidence. *Crawford-El v. Britton*, 523 U.S. 574 (1998).

In this case, Plaintiff alleges that Defendants violated two constitutional rights. First, she

alleges the Defendants violated her Fifth Amendment rights by taking her chimps without just compensation. Second, Plaintiff alleges that Defendants took her chimps without providing her due process in violation of the Fourteenth Amendment.[2] In order to sustain a takings claim, Plainitiff must demonstrate that Defendants took her private property without providing her adequate compensation. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194 (1985). In order to sustain a due process claim, Plaintiff must demonstrate that Defendants deprived her of a particularized property interest without due process of law. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). Thus, in order to succeed on either claim, Plainitiff must establish that she had a property interest.

In her complaint, Plaintiff states that she owned the chimps and therefore had a property interest in them. In her response, she reiterates that she had a property interest in the chimps and also contends that the OSU MOU and other documents provided her with a protected property interest. The Court shall analyze these two contentions *seriatim*.

Under Ohio law, animals are property. *See Carcorp, Inc. v. Chesrown Oldsmobile*, 150 Ohio App.3d 87, 94 (2004). Thus, if Plaintiff owned the chimps, she had a protected property interest in them. Defendants do not contest this assertion. Rather, they proffer four reasons that the chimps belonged to OSU and not Plaintiff.

First, Defendant produce seven "donation agreements." After an outside accrediting

---

[2]In order to establish whether Defendants violated the Takings Clause or the Due Process Clause, the Court would have to go engage in a step by step analysis of each right. This, however, is unnecessary in this case because the qualified immunity analysis dispositively turns on the second prong of the *Wilson* test. Therefore, the Court will only examine the "property interest" prong of each right.

agency audited the Chimp Center, it suggested that the Chimp Center obtain documentation of ownership and origination of the chimps already in its possession. The Chimp Center complied. These donation agreements were executed between various donors and the Chimp Center. They stated in relevant part that the chimps were donated to "The Comparative Cognition Project of the Ohio State University." Moreover, they stated that the donors "reliquish[ed] to Ohio State all rights" in the chimps. These seven identical agreements were executed with respect to Sheba, Ivy, Keeli, Darrell, Kermit, Digger[3], and Abby. None of these agreements explicitly gives Plaintiff a property interest in the chimps although she did sign her name to them, under the title "Director, Comparative Cognition Project." Defendants contend that she was signing on behalf of the Chimp Center and not in her personal capacity.

As noted above, seven out of the eleven chimps have donation agreements vesting the Chimp Center with ownership. The eighth chimp, Sarah, was donated to the Chimp Center by the University of Pennsylvania in 1987. Defendants produce a letter from Dr. Naylor, the head of OSU's Psychology Department in 1987, and Dr. Boysen which discusses Sarah's impending donation. It states that "current negotiations [are] underway between our project [the Chimp Center], and the University of Pennsylvania" regarding the donation of Sarah. Defendants assert that this letter indicates that the University of Pennsylvania donated Sarah to the Chimp Center and not to Plaintiff personally.

The ninth and tenth chimps, Emma and Harper, do not have ownership documentation. A research facility at the University of Texas donated them to either OSU or Plaintiff. Plainitiff purportedly purchased the eleventh chimp, Bobby, with her own funds. Defendants stand ready

---

[3]Digger's donation agreement is "not fully executed."

to compensate Plainitiff for Bobby if she can show proof of purchase.

     Second, as evidence of OSU's ownership of the chimps, Defendants cite the fact that the Chimp Center had possession and control of the chimps and, through federal grants and university donations, OSU paid for their housing and care. Third, Defendants point to the language of the OSU MOU. The OSU MOU, which discusses what would happen to the chimps in the contingency that the Chimp Center ran out of funding, specifically states that it is "between Department of Psychology, College of Social and Behavioral Science, Office of Research, and Office of Academic Affairs." The heads of these four branches signed the document as well as Plaintiff under the heading "Professor, Department of Psychology." The OSU MOU also states that the University, and not Plaintiff, will provide up to $150,000 in funds to support the Chimp Center during the pendency of Dr. Boysen's application for new grants. In addition, the OSU MOU specifically states that OSU will be moved to another facility, with or without Plaintiff, if the Chimp Center's funds dropped below a specified level. Fourth, Defendants cite the language of the Chimp Haven MOU. The Chimp Haven MOU states that Chimp Haven "will accept ownership of the OSU chimpanzees" and that "upon transfer of ownership, Ohio State shall have no further obligations with respect to the care of the chimpanzees, financial or otherwise." On the whole, Defendants make a strong case that the Chimp Center/OSU, and not Dr. Boysen, owned the chimps.

     Plaintiff first relies on several affidavits to support her ownership of the chimps. She produces three affidavits, aside from her own, which she purports show that it was the intent of the various donors to give the chimps to her personally, and not to OSU. The first affidavit is from Dr. Frederick King, a researcher from Emory University. In 1994, Dr. King donated

Kermit and Darrell to OSU/Plainitiff. He later personally signed a donation agreement. In his affidavit, Dr. King states that he intended to donate these two chimps to Plaintiff and not to OSU, despite what he may have agreed to by signing the donation agreement. Defendants retort that the Court may not consider his affidavit because it violates the parole evidence rule.[4]

The second affidavit is from Susan Lambeth, a researcher at the University of Texas. She testifies that she worked with Dr. Michaele Keeling, and it was the intention of both Dr. Keeling and herself to donate Emma and Harper to Dr. Boysen. Defendants retort that the transfer documents that accompanied these two chimps indicate that they were being donated to OSU and not Plaintiff.

The third affidavit is from Dr. Robert Rescorla, a Professor of Psychology at the University of Pennsylvania. Dr. Rescorla testifies that it was "his understanding" that Dr. Premak, the director of a primate research facility at the University of Pennsylvania, donated Sarah to Dr. Boysen and not OSU. Defendants argue that this affidavit is speculative and irrelevant because Dr. Rescorla does not have first hand knowledge of the transfer.

In addition, Plaintiff asserts that she was a party to the donation agreements. Although her name was signed under her title as Director of the Chimp Project at OSU, she contends that OSU understood that she was a party to these agreements because the Chimp Center had never been a part of OSU. She further alleges that she was a party to the OSU MOU. Plaintiff points to the fact that while other signatories of this agreement signed under their official titles as heads of specific departments at OSU, whereas she simply signed as "Dr. Boysen, Professor

---

[4]The Court need not, and will not, consider whether this affidavit violates the parole evidence rule because of dispositive arguments discussed below.

Department of Psychology."

The true owner of the chimps presents a question for this Court. The donation agreements represent strong evidence that at least 7 of the chimps were the property of OSU. Moreover, given that the majority of the funds for the housing, care, and research of the chimps came from OSU, OSU has a strong claim of ownership of all the chimps. Planitiff's evidence is specious at best. She has presented no ownership documents and cannot show that her personal funds were used to care for the chimps. This Court, however, need not decide the issue of ownership in order for it to rule on Defendants' Motion because the second prong of the qualified immunity analysis proves dispositive.

Before the Court moves on to the second prong of the *Wilson* test, it will address Planitiff's argument that she also "had a property interest created by agreements or contracts." More specifically, Plaintiff asserts that the OSU MOU and the donation agreements gave her a protected property interest in the disposition of the chimps. Private contractual arrangements can create a particularized property interest for the purpose of due process. *See, e.g., Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir.2004); *Mertik v. Blalock*, 983 F.2d 1353, 1360 (6th Cir. 1993). Plaintiff, however, fails to point out how the OSU MOU or the donations agreements constitute "contracts."[5] Plainitiff does not point to an offer or an acceptance in any of these documents, nor does she delineate where these documents recite consideration. Once again, however, because the second prong of the qualified immunity analysis proves dispositive, the Court shall assume that Plaintiff could establish that she had a particularized property interest

---

[5]In fact, Plaintiff says "assuming that the agreements were valid contracts" . . . they vest protectable rights in Boysen.

created by these agreements.

Assuming that Plaintiff can establish at trial that Defendants violated her Fifth and Fourteenth Amendment Rights, she still must show that these rights were clearly established such that a reasonable official would know that his conduct violated them in order to overcome Defendants claim for qualified immunity. The phrase "clearly established," for this purpose, means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Plaintiff argues, at length, that the Due Process Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment are clearly established because they have been the subject of decades of jurisprudence and, as a result, reasonable officers should know the protections they afford. Plaintiff's argument misinterprets the correct application of the second prong of the qualified immunity standard and, therefore, is devoid of merit. The inquiry of whether a particular right is clearly defined must be taken in light of the specific context of the case and not as a broad general proposition. *Dunigan*, 390 F.3d at 491. It could plausibly be asserted that, because the Fifth and Fourteenth Amendments were enacted decades ago and have been the subject of hundreds if not thousands of court decisions, the rights they contain are "clearly established." *See, generally, Wilson*, 526 U.S. at 615. However, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.* This means that the Court must not analyze whether the rights

prescribed by the Fifth and Fourth Amendments are clear, but rather, whether a reasonable officer could have believed that shipping the chimps to Chimp Haven without, allegedly, providing Plaintiff with compensation and due process was lawful, in light of clearly established law and the information the officer possessed. *See generally id.; Anderson v. Creighton*, 483 U.S. 635 (1987).

In this case, Plainitiff's rights under the Fifth and Fourteenth Amendments are not clearly established because Defendants had legitimate reasons to believe that Plainitiff did not have a protectable property interest in the chimps, the donation agreements, or the MOUs.  If the Defendants reasonably believed that Plaintiff did not have an interest in the chimps, then it follows that they could reasonably believe that shipping the chimps from the Chimp Center without Plainitiff's permission would not violate the Fifth or Fourteenth Amendments.  The donation agreements expressly gave the chimps to OSU.  OSU expended millions of dollars for the chimps housing, care, and research.  Plaintiff, in the OSU MOU, expressly acknowledged that the chimps might be given away to another facility with which she was not associated.  In fact, she expressly agreed that the chimps could be shipped to Chimp Haven, the chimps current location, in the event that the Chimp Center lost funding.  If the Chimp Center's funding diminished to a certain level, then OSU would likely have to pay for their continued care.  Moreover, this Court, in denying Plaintiff's motion for a TRO, did not find it likely that the Plaintiff had a protectable property interest in the chimps.  Taken a as a whole, these facts show that Defendants could reasonably have believed that OSU, and not Plaintiff, owned the chimps.

In addition, Defendants could reasonably have believed that Plaintiff did not have a protectable property interest given to her by the OSU MOU or the donation agreements.  First,

based on the wording of these documents and the signature line, Defendants could reasonably have believed that Plaintiff was signing on behalf of OSU and not in her personal capacity. Second, there is little evidence that these documents were contracts. In fact, there is no evidence that Plaintiff has asserted that these documents were contracts prior to her motion in opposition. Therefore, it was reasonable for Defendants to have believed that these documents were not contracts which vested protectable rights in Plaintiff.[6]

The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Defendants reasonably believed that OSU, and not Plaintiff, owned the chimps. As such, Plaintiff's rights were not clearly established. For the aforementioned reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment based on qualified immunity.

---

[6]Also, in regards to Plaintiff's Fourteenth Amendment claim, Defendants could have reasonable believed that the process they provided her before they sent the chimps to PPI satisfied the Due Process Clause.

## V.  CONCLUSION

For the reasons stated herein, Defendants are entitled to sovereign, state statutory, and qualified immunity on Plaintiff's various claims.  Thus, their Motion for Summary Judgment is **GRANTED.**

    **IT IS SO ORDERED.**

                                                 <u>s/Algenon L. Marbley</u>
                                                 **ALGENON L. MARBLEY**
                                                 **UNITED STATES DISTRICT JUDGE**

**DATED: March 19, 2007**